UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

L. DON GIBBONS,     )
            )
  Plaintiff,     )
            )
vs.          )  Case No. 2:16-cv-1950-GMB
            )
CVS HEALTH CORPORATION,  )
*et al.*,          )
            )
  Defendants.    )

## MEMORANDUM OPINION AND ORDER

Before the court is Defendants' Motion for Summary Judgment. Doc. 68.

Defendants CVS Health Corporation; Alabama CVS Pharmacy, LLC[1]; and Mike

Dramer seek dismissal of Plaintiff L. Don Gibbons' claims arising from his alleged

discriminatory termination. Doc. 69. This matter has been fully briefed, oral

argument has been heard, and the court has considered the evidence and arguments

set forth by all parties. The parties have consented to the jurisdiction of a magistrate

---

[1] Defendants have asserted that CVS Health Corporation is a holding company and was not the
plaintiff's employer. Instead, they claim that Alabama CVS Pharmacy, LLC is the correct
employer, but is not properly named in the complaint. Defendants have defended this action on
behalf of Alabama CVS Pharmacy, LLC, and the Clerk is DIRECTED to change the style of the
case to reflect the defendant's correct name. There remains a fact dispute as to whether CVS
Health Corporation could be deemed a co-employer. Accordingly, to the extent Defendants seek
dismissal of all claims against CVS Health Corporation in footnote 1 of their brief in support of
the motion for summary judgment, that motion is DENIED. The court collectively designates
these defendants in this opinion as "CVS."

judge pursuant to 28 U.S.C. § 636(c).

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgement is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v.*

*Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II. FACTUAL BACKGROUND

Resolving all factual inferences in favor of Gibbons, the nonmovant, the facts are as follows.

Gibbons was more than 40 years old when his employment with CVS ended on October 22, 2015. Docs. 1-1 at 2 & 67-4 at 6. Starting in 1990, he had worked as an assistant manager at Big B Drugs, which then merged with CVS. Doc. 67-1 at 6. Gibbons remained with CVS until 2005, when he left briefly for other employment, but he returned to the drugstore chain in 2007 as a store manager. Doc. 67-4 at 9. In 2013, Gibbons asked for a transfer to a store in northern Alabama. Doc. 67-1 at 9. In 2014, CVS transferred Gibbons to a store in Warrior, Alabama, which is located within CVS's District 6. Docs. 67-1 at 9 & 67-4 at 9. Defendant Mike Dramer is the district manager for District 6. Docs. 67-3 at 5 & 67-6 at 21.

While Gibbons managed the store in Warrior, Dramer reported that Gibbons "took a struggling [store] and brought it around to a great store." Doc. 67-4 at 3. Gibbons knew that CVS would be opening a new store in Cullman, Alabama, also located within Dramer's district, and asked to be considered for the position of store manager in Cullman. Doc. 67-1 at 9. CVS hired him as the manager and gave him

responsibility for hiring and training new staff at the Cullman store. Doc. 67-1 at 15.

Stacy Nunnelley worked for CVS as a cashier off and on from December 2003 through March 2005. Doc. 67-6 at 12−13. She later returned to CVS and began to train as a store manager. Doc. 67-6 at 23. Nunnelley was promoted to assistant store manager for the Cullman store in 2014. Doc. 67-7 at 2. During the time relevant to this action, Nunnelley was in her 20s.

Both Nunnelley and Gibbons were scheduled to work 45 hours per week at the Cullman CVS store. Doc. 67-11 at 6. Dramer sent an internal memo on October 7, 2015, telling managers that "leaving early or coming in late on occasion" was acceptable, but that doing so regularly was not. Doc. 67-11 at 6. "Regularly" was defined as more than once per week. Doc. 67-11. The memo further stated that failing to work the "45-hour base" would "place unnecessary strain" on other employees and the store. Doc. 67-11.

As an hourly employee, Nunnelley was required to clock in and clock out. Doc. 67-1 at 23. CVS did not require store managers, like Gibbons, to clock in and clock out. Doc. 67-1 at 23. Instead, as salaried employees, store managers only had to let the district manager know if they were coming in late or leaving early. Doc. 67-11 at 6. Gibbons testified that "[t]here was no set time that I worked," and at times he worked 60 to 80 hours per week. Doc. 67-1 at 32.

In September 2015, Nunnelley had emergency gallbladder surgery and took medical leave for three weeks. Doc. 67-1 at 32; Doc. 67-6 at 33 & 82.  She returned to work on September 28, 2015. Doc. 67-6 at 33.  On the day Nunnelley returned to work, Gibbons saw her talking on her cellular phone while checking out customers at the register. Doc. 67-1 at 34.  Gibbons had received complaints about Nunnelley's excessive cell phone usage from other CVS associates, so Gibbons counseled Nunnelley about her use of the cell phone while at work. Docs. 67-1 at 34 & 67-6 at 59.  During the meeting, Nunnelly became upset. Doc. 67-6 at 83.  She pulled out a piece of paper from the printer, wrote a letter of resignation,[2] and then left Gibbons' office. Doc. 67-6 at 87.  Gibbons watched on the store's video cameras as Nunnelley walked to the front of the store, placed her keys on the counter, and walked out.[3] Doc. 67-1 at 42.

Gibbons and Dramer exchanged text messages about this encounter, and Dramer told Gibbons that he would not accept Nunnelley's resignation until he had a chance to address it. Doc. 67-1 at 47.  Gibbons said he had not accepted the

_____

[2] This letter has not been placed into evidence.  The evidence before the court does not reflect whether the letter was a formal notice of an intent to resign, such as a two-week notice, or a less formal recitation of her intent.

[3] Nunnelly testified that she picked up her keys from the front counter and left the store, not that she placed her keys on the counter as she left. Docs. 67-7 at 57 & 67-6 at 88.  For summary judgment purposes, the court accepts as true Gibbons' testimony that Nunnelly placed her keys on the counter.  While Defendants have offered into evidence a screenshot from the video camera that apparently shows Nunnelly leaving the store—perhaps with keys in hand—the image does not conclusively show that Nunnelly took her store keys with her. Doc. 67-2 at 58.

resignation letter either. Doc. 67-5 at 54. Dramer told Nunnelley to return to the store the next day to work her shift. Doc. 67-5 at 5. Nunnelley continued to work at the Cullman store. Doc. 67-1 at 47.

About the same time, Nunnelly told Dramer that she had received complaints that Gibbons had not been working his posted shifts and had been leaving inexperienced colleagues alone in the store in violation of CVS policy. Doc. 67-6 at 65−67. In connection with those complaints, Dramer conducted interviews of some of the store's employees, including Gibbons. Doc. 67-1 at 50. Dramer also exchanged text messages with Nunnelly, asking when Gibbons got to the store and what time he left on certain days. Doc. 67-5 at 8−21. On October 21, 2015, Dramer called Gibbons and told him to come to the regional office the next day for a meeting. Doc. 67-1 at 53. On October 22, Gibbons drove to CVS's office in Bessemer, where he met with Dramer and Jeff Hardage,[4] a human resources officer. Doc. 67-1 at 54. Dramer asked Gibbons to tell them when he had worked at the store on specific days, and he reminded Gibbons not to lie. Doc. 67-1 at 54. Gibbons could not recall the times that he arrived or left the store on the days in question. Doc. 67-1 at 54. The conversation became heated, and Dramer told Gibbons to leave his office. Doc. 67-1 at 55. At that point, Gibbons "got up" and "laid [his] keys on the table." Doc. 67-

---

[4] For reasons unexplained, Hardage later became known as Jeff Hodges. Doc. 67-10 at 2. He is designated in this opinion as Hardage, but both names appear in the parties' exhibits.

1 at 55.  Dramer asked him, "What is this?"  Gibbons replied, "You asked me to leave . . . your office, and what does it look like?" Doc. 67-1 at 55.

Gibbons then left the regional office. Doc. 67-1 at 55.  He planned to drive back to the Cullman store to look up phone numbers and email addresses in order to take his concerns "up the chain of command" at CVS. Doc. 67-1 at 58.  While driving, Gibbons got a text from Mike Moss, the manager of the Fultondale, Alabama CVS store, that said, "Sorry to hear it?" Doc. 67-1 at 60.  Gibbons texted back, "What do you mean?" Doc. 67-1 at 60.  In a phone call shortly after the texts, Moss told Gibbons that Dramer held a conference call that afternoon and told all of the store managers in District 6 that Gibbons had "left the company." Doc. 67-1 at 60.  Gibbons told Moss that he had not resigned.[5] Doc. 67-1 at 60.  After the call with Moss, he returned home instead of going to the Cullman store. Doc. 67-1 at 60.  Based on this information from Moss, Gibbons believed that he had been "told [he] wasn't working for the company anymore." Doc. 67-1 at 60.

On October 23, the day after the meeting, Gibbons called the CVS human resources department to inquire about his status, and he was told that he was still employed with CVS. Doc. 67-1 at 60.  He then tried to call Hardage, but Hardage

_____

[5] Moss has submitted an affidavit in which he asserts that Gibbons admitted he resigned, and that he later said he probably "shouldn't have done that." Doc. 67-8.  This testimony does not resolve the factual dispute discussed below.

was out of town. Doc. 67-1 at 61. Gibbons sent Hardage an email, and Hardage replied on the following Monday by referring Gibbons to another human resources employee.[6] Doc. 67-1 at 120. Gibbons contacted the human resources department again that Monday and now was told that he had been terminated as of October 23. Doc. 67-1 at 61. CVS personnel records state that Gibbons was "terminated." Doc. 67-1 at 61. Nunnelley replaced him as the manager of the Cullman store. Doc. 67-3 at 8.

Beginning on October 23, 2015, Gibbons made 15 complaints to a company "ethics line." Doc. 67-1 at 124−50. Gibbons' first complaint, on October 23, was about the meeting with Dramer. Doc. 67-1 at 124. He described Dramer's behavior as "disrespectful and rude," and elaborated that it "[s]eems like Mike is seeking revenge for something. Unprofessional and not to CVS standards of leadership." Doc. 67-1 at 124. The second complaint, on October 24, reported that Nunnelley and another employee had engaged in "coupon fraud" and other misconduct. Doc. 67-1 at 128. On October 28, Gibbons complained about a disparity between his pay and Nunnelley's pay. Doc. 67-1 at 130.

---

[6] While Hardage testified that he did not hear from Gibbons until October 24, the evidence viewed in the light most favorable to Gibbons indicates that he did try to call Hardage on October 23, but was told that Hardage was out of town. *See* Doc. 67-1 at 61. Gibbons testified that he later sent Hardage an email, but he does not specify whether the email was sent the same day as he made the call or the next day, October 24, which comports with Hardage's affidavit.

On December 6, 2016, Gibbons filed the complaint that commenced this action. Doc. 1. He asserts the following claims: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Alabama Age Discrimination in Employment Act, Alabama Code § 25-1-20, *et seq.* ("AADEA"); (2) retaliation in violation of the ADEA; and state-law claims of (3) libel and slander; (4) defamation; (5) negligent and wanton hiring, training, supervision, and retention; (6) tortious interference with contractual or business relations; (7) invasion of privacy; and (8) intentional infliction of emotional distress. Essentially, Gibbons asserts that CVS treated him unfairly by firing him and replacing him with Nunnelley, a younger employee, and that CVS treated him differently than Nunnelley when she indicated her desire to resign. Defendants assert that Gibbons' complaints of unfair treatment on the basis of age are not supported by the evidence and that his retaliation claim is not viable because he did not engage in any protected activity. As to the state-law claims, Gibbons concedes that summary judgment is due to be granted as to the claims of slander, defamation, tortious interference, and invasion of privacy, but contests summary judgment as to the state-law claims of negligent or wanton hiring, training, supervision, or retention and intentional infliction of emotional distress. Doc. 79 at 34.

# III.  DISCUSSION

## A.    Age Discrimination

Gibbons bases his first claim on the federal prohibition against age discrimination in employment (the ADEA) and the Alabama analogue (the AADEA).[7]  These statutes prohibit an employer from discharging or discriminating against an employee because of his age and apply to any employee who is at least 40 years old. 29 U.S.C. § 623(a)(1).  Under either statute, Gibbons bears the burden of proving that his age was the "but-for" cause of any adverse employment action. *Gross*, 557 U.S. at 178.

To survive a motion for summary judgment, Gibbons first must establish a *prima facie* case by showing that he was (1) a member of the protected age group, (2) subjected to an adverse employment action, (3) replaced by a substantially younger person, and (4) qualified to do the job from which he was discharged. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).  An employee who establishes a *prima facie* case creates a "presumption of unlawful discrimination." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir.

---

[7] Courts analyze age claims under these statutes using the same framework as Title VII claims. *See, e.g.*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057 (11th Cir. 1994).  The state-law age claim is an alternative to the federal remedy and Gibbons cannot recover for discrimination under both statutes, but the issues at summary judgment relate to the quality and quantity of Gibbons' evidence and apply to both the federal- and state-law claims.

2016).

When an ADEA claim is based on circumstantial evidence, as in this case, the court applies the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Liebman*, 808 F.3d at 1298. Therefore, once the plaintiff has established a *prima facie* case of discrimination, "the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Kragor*, 702 F.3d at 1308. If the employer rebuts the presumption, the plaintiff then has the burden of demonstrating that the reason given by the employer is a pretext for discrimination by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable juror could find the reason to be "unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

### 1.     Prima Facie *Showing*

There is no dispute that Gibbons was over 40 years old; was qualified for the job of store manager; and was replaced by Nunnelly, a substantially younger employee. As a result, the parties agree that the primary issue that must be resolved is this: Did Gibbons quit or was he fired? If he resigned, Defendants did not subject him to an adverse employment action, and he cannot establish a *prima facie* case of

discriminatory discharge.  If he was fired, he may meet his *prima facie* burden.[8]

The evidence that Gibbons resigned from his employment with CVS is compelling.  After Dramer confronted him about whether he had been working his assigned hours, Gibbons placed his store keys on his supervisor's office and walked away.  But CVS is saddled with the fact that its internal documentation reflects that it "terminated" Gibbons.  Defense counsel argued at the hearing on this motion that "termination" is a term of art CVS used so that Gibbons would be ineligible for rehire, but in the context of the summary judgment record CVS's use of this terminology creates a fact issue as to whether Gibbons quit or was fired.[9]  This is particularly true when the conversation between Dramer and Gibbons immediately before Gibbons left the office does little to resolve any ambiguity since Gibbons' rhetorical question—"[W]hat does it look like?"—is subject to multiple interpretations.  If a jury concluded that Gibbons was fired, it could then consider whether Gibbons was treated differently from Nunnelly, a younger employee, who also expressed an intent to resign but was asked to return to work.[10]

---

[8] Defendants assert, and the court agrees, that Gibbons has not set forth any claim of a hostile environment based on age, and that he has not made any claims based on gender or race even though he repeatedly noted in deposition that CVS replaced him with a woman.  To the extent Gibbons is attempting to allege a hostile environment or any claims based on any statute other than those offering protection based on age, those claims are due to be dismissed.

[9] Hardage's declaration also states that he used the term "termination" so that he could guarantee that Gibbons would not be eligible for rehire. Doc. 67-10 at 7.

[10] Resolving all reasonable inferences in Gibbons' favor, there is sufficient evidence for a jury to conclude that Nunnelly, an assistant store manager who wrote out a resignation letter during a

Viewing the facts in the light most favorable to the nonmovant, the court must credit Gibbons' claim that he put his keys on the desk and left Dramer's office in an effort to diffuse a tense situation and because Dramer told him to leave. Doc. 67-1 at 55. Gibbons also has explained that he intended to take the issue up the CVS chain of command. Doc. 67-1 at 58. To be sure, CVS has introduced evidence that calls into question Gibbons' credibility by indicating that he had cleaned out his office of all personal possessions before he went to the meeting with Dramer and noting that he never returned to work another shift at CVS after the meeting.[11] Doc. 67-9 at 4–5. At this juncture, however, the court must draw all reasonable inferences in Gibbons' favor. Accordingly, there is a fact question as to whether Gibbons resigned his employment or CVS fired him, and therefore for summary judgment purposes Gibbons has met his burden of establishing a *prima facie* case of age discrimination. *See, e.g., Jelks v. Decatur Plastic Prods., Inc.*, 2008 WL 11378915 at *15 (N.D. Ala. 2008).

---

heated confrontation with her supervisor about her job performance and then set her keys on the counter and left the store, was similarly situated to Gibbons, a store manager who left his keys on his supervisor's desk and left the office after a heated exchange about his job performance.

[11] Gibbons disputes that he took all of his personal possessions from the office before he went to the meeting with Dramer. Doc. 67-1 at 58–59. And his correspondence with the human resources department indicates that he had been scheduled to take vacation days after the meeting, which CVS has not disputed. Doc. 67-1 at 122. In addition, there is evidence that Gibbons later told other prospective employers that he had resigned from CVS. Docs. 67-13 at 7 & 67-14 at 14. These competing facts do not resolve the core fact question.

Defendants alternatively assert that the discriminatory discharge claim is due to be dismissed because Gibbons' made an "unequivocal concession" in his deposition that age animus did not motivate the decision to terminate him. Defendants rely on two cases for this proposition: *Peters v. Healthsouth of Dothan, Incorporated*, 542 F. App'x 782, 787 (11th Cir. 2013), and *Ross v. Jefferson County Department of Health*, 701 F.3d 655 (11th Cir. 2012). The relevant deposition testimony follows:

Q. And the basis of your discrimination—and what's the basis of your claim of discrimination?

A. Well, I feel like Stacey was treated differently than me on the outcomes.

Q. And just so I'm clear, because I don't want to put words in your mouth. And because we had to end the deposition the last time right when we were about to finish this. We had gone through some of the ethics charges that you filed. And in those ethics charges, you wrote out what you considered to be the discrimination, correct?

A. Correct.

Q. And it was that you put your keys down and left and were not allowed to come back, but she left and was allowed to come back?

A. Correct.

Q. Okay. Is that the complete basis of your claim of discrimination, that's the way she was treated differently, that's why you are claiming discrimination?

A.     I mean, other than—than age difference, younger female compared to an older female—male that's making more money, bringing her in at a cheaper salary.

Q.     All right.  And that is what I'm trying to get to is that you believe, it is your—that you have filed a claim of age discrimination and—or discrimination because you believe that she was allowed to come back and you were not allowed to come back because she is younger than you, the age difference?

A.     The age difference—I didn't take that into account of why I thought she could lay her keys—and resign and write a letter of resignation, and I just merely laid down my keys and I'm terminated.

Q.     All right.  Well, if I—in understanding that CVS's position is that you quit or resigned, my question to you really is, if you didn't take into account—and I understand that, you didn't take into account the age difference—your feeling was is [sic] that you were discriminated against because CVS let or told Stacey they were not going to accept her resignation, and she was to report back to work the next day until this could be looked into, and you were treated as having resigned?

Mr. Haynes: Object to form.

A.     I was treated as resigned.  Is that what you—I was treated as a terminated employee.  I didn't—I didn't resign.

Q.     I understand that your position is that you didn't resign.  I'm trying to get you to tell me.  You said that you didn't take into account the age difference.  I'm trying to get you to explain to me what it is, how you felt you were treated differently and discriminated against.

A.     There was a female that was allowed to lay down her keys, write out a letter of resignation, communicate to everyone in the store, and she was allowed to come back to gain her employment back. I did not resign.  I laid my keys down.  I was told I was terminated.  Mike Dramer is the one that called the conference

> call and informed all of my peers the same thing. So I felt like the female had been treated differently than the male.

> Q.   Okay. All right. All right. So that is the basis of your discrimination claim. You felt like the female was treated differently than the male?

> A.   Yes.

Doc. 67-2 at 10. As the purported unequivocal concession, Defendants identify Gibbons' admission that, when pressed on whether age played a role in his disparate treatment, he "didn't take that into account of why [he] thought [Nunnelley] could lay her keys" on the table but CVS allowed her to return to work. Doc. 83 at 7–8.

A close reading of the authority for Defendants' position reveals that this testimony is not the type of unequivocal concession that undercuts a *prima facie* showing. In *Ross*, 701 F.3d at 661, the Eleventh Circuit found that the plaintiff had waived her complaint of racial discrimination because, when asked at deposition whether she "[felt] like [her] termination had anything to do [with] . . . [her] race," she simply responded, "No." Characterizing this testimony as an "unequivocal concession," the court affirmed the district court's grant of summary judgment in the employer's favor on this claim. *Id.* The district court had determined that in the face of such testimony "it would be impossible for a claim of race discrimination to stand." *Ross v. Jefferson Cty. Dep't of Health*, 2011 WL 13175667, at *11 (N.D. Ala. Aug. 10, 2011).

In *Peters*, 542 F. App'x at 787, the plaintiff complained about race-based remarks made by her immediate supervisor, a black man. She claimed that her termination was racially motivated and that her employer subjected her to a hostile environment in retaliation for complaining about her supervisor's conduct. *Id.* at 785. The Eleventh Circuit held that she did not make a *prima facie* showing of a race-based termination because the "undisputed evidence shows that [the decisionmaker], a white woman, made the decision to fire Peters for failing to properly submit her quarterly marketing plan and that [her supervisor] was in no way involved in that decision." *Id.* The court determined that there was no evidence that the alleged comparator had "similarly failed to submit" the marketing plan. *Id.* But the court noted that the plaintiff "acknowledged in her deposition testimony that she did not believe that [the decisionmaker] had discriminated against her because of her race." *Id.* at 787. The court, relying on *Ross*, reasoned that this "concession alone was enough to warrant summary judgment on Peter's claim of discriminatory discharge." *Id.*

The *Ross* and *Peters* admissions sharply contrast with Gibbons' purported concession. Gibbons mentioned age discrimination during his testimony, explaining that his complaint related to "age difference, younger female compared to an older male." Doc. 67-2 at 10. And the alleged admission is largely unintelligible, unlike the plain admissions in *Ross* and *Peters*. In context then, Gibbons' statement that he

"didn't take [age] into account"—if this, in fact, is what he intended to convey—cannot reasonably be considered fatal to his age discrimination claims. *Ross* and *Peters* do not compel summary judgment on an ambiguity.

## 2. *Legitimate Nondiscriminatory Reason and Pretext*

Defendants assert that, even if they did take an adverse employment action by terminating Gibbons' employment, they had a legitimate, nondiscriminatory reason for doing so. Doc. 69 at 23−24. Defendants explain that the nondiscriminatory reason for the termination was that "Gibbons put his keys down and walked out." Doc. 69 at 23–24.[12] But in the same breath CVS insists that Dramer and the human resources department employees believed that Gibbons resigned when he surrendered his keys and left Dramer's office. Doc. 69 at 24. In light of Defendants' unwavering position that CVS took no adverse action against Gibbons, the explanation that CVS terminated him because Dramer thought he had resigned does not hold water.

This is not the first age discrimination case involving a factual dispute over resignation or termination. In *Wigley v. R&D Maintenance Services, Incorporated*, 2009 WL 2222706 (S.D. Ala. July 22, 2009), a maintenance employee turned in his keys and radio and walked off of the job site. The employee alleged that he did not

_____

[12] CVS has never alleged that it terminated Gibbons because of the allegations that he did not work the required number of hours, left inexperienced employees alone in the store, or lied about his hours.

intend to quit his job and only left to lodge a complaint about age discrimination. *Id.* at *3. But his employer told him that he had been fired. *Id.* at *4–5. At the summary judgment stage, the employer in *Wigley* argued that it had a legitimate, nondiscriminatory reason for the termination, asserting (in the alternative to the argument that he had quit) that he was terminated for leaving the work site without permission. The district court, however, noted that this argument assumed that Wigley did quit, which was a fact in dispute. *Id.* at *9.

In the instant case, as in *Wigley*, the employer bases its articulated reason for the adverse action on its position that the employee voluntarily resigned. The *Wigley* court denied summary judgment, noting that, because the facts offered by the plaintiff "could reasonably undermine" the employer's statement that it fired the plaintiff for walking off the job, those facts could "expose that reason for termination as pretextual." *Id.* at *9. Similarly, Gibbons' claim of discrimination survives the motion for summary judgment because, even if the assertion that he resigned is a legitimate nondiscriminatory reason, Gibbons' version of the facts, when combined with all reasonable inferences from those facts, undermine this reason and could convince a jury that the reason is pretextual, as in *Wigley*. Defendants' motion for summary judgment on the age discrimination claim is due to be denied.[13]

---

[13] Defendants also argue that this claim fails because Gibbons has not proven that the motivation for any disparate treatment was age-based bias and not Dramer's favoritism for Nunnelly. At this stage of the proceedings, however, the court cannot conclude that no reasonable jury could infer

## B.  Retaliation

A plaintiff may establish a *prima facie* case of retaliation by demonstrating that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse employment action, and (3) there is a causal connection between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (per curiam).  The causation element is to be construed broadly, so that the plaintiff need only prove that the protected activity and the adverse action are not completely unrelated. *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).  By definition, however, the protected activity must be the act of "oppos[ing] any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d).

Gibbons' retaliation claim fails because there is no evidence that he engaged in any protected activity before his employment ended.[14]  Any protected activity after Gibbons' termination is irrelevant to his retaliation claim, and Gibbons' only complaint before his employment ended on October 23, 2015 was that it "[s]eems

---

age-based bias from CVS's differential treatment of Gibbons and Nunnelly. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."); *Trask v. Sec'y, Dep't of Vet. Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016) (holding that the *prima facie* case creates a rebuttable presumption that the employer acted illegally).

[14] Defendants also claim that the retaliation claim was not exhausted because it was not properly raised before the EEOC and that the "but-for" standard enunciated in *Gross* prevents Gibbons from simultaneously pursuing both an age discrimination claim and a retaliation claim.  The court finds these grounds for summary judgment to be without merit.

like Mike is seeking revenge for something." Doc. 67-1 at 124. The record does not reflect any evidence that Gibbons engaged in other potentially protected activity before or on the date of his termination. Even assuming that he filed the "revenge" complaint before his termination decision became final,[15] a bare allegation of indiscriminate revenge is not a complaint about age-based discrimination under the ADEA. *See Smith v. Wynfield Dev. Co.*, 451 F. Supp. 2d 1327, 1349 (N.D. Ga. 2006) (finding that plaintiff did not engage in statutorily protected activity where internal complaint did not mention age discrimination); *Tyburski v. City of Chicago*, 2018 WL 3970150, at *10 (N.D. Ill. Aug. 20, 2018) (finding that internal grievance is not protected activity where grievance does not complain about age discrimination). Accordingly, this internal complaint cannot be considered protected activity, and Gibbons' retaliation claim is due to be dismissed.

## C.    State-Law Claims

Defendants seek the dismissal of the remaining state-law claims of negligent or wanton hiring, training, supervision, or retention and intentional infliction of emotional distress. Doc. 69 at 34.

---

[15] Gibbons' brief does not support this assumption in as much as it alleges that the complaint was posted on October 26, 2015, three days after the termination. Doc. 79 at 31. In addition, there is no evidence that Dramer or Hardage knew of Gibbons' complaints at the time his employment ended.

### 1.    Negligent or Wanton Hiring, Training, Supervision, and Retention

To establish a successful claim here, Gibbons must show that "the allegedly incompetent employee committed a common-law, Alabama tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002). Gibbons argues that he can prove both a state-law discrimination claim and the tort of outrage to support his claim of negligent or wanton hiring, training, supervision, or retention. Doc. 79 at 35. Neither option supplies an appropriate foundation.

Gibbons' attempt to rely on his state-law discrimination claim fails on the law. Gibbons alleges that "CVS was on notice that Dramer had a history of engaging in favoritism and discriminatory conduct in the workplace and failed [to] take all necessary steps to [e]nsure that his conduct did not continue." Doc. 79 at 35. But "the Alabama statutory cause of action for age discrimination [is] not Alabama common law." *Shackelford v. Publix Super Markets, Inc.*, 2014 WL 5148461, at *16 (N.D. Ala. Oct. 14, 2014). As a result, this cause of action "cannot support a claim of negligent hiring, training, retention, and supervision." *Id.* Accordingly, Gibbons cannot rely on the alleged discrimination claim to support a negligent or wanton hiring, training, supervision, or retention claim.

Gibbons' reliance on the tort of outrage is misplaced because the facts at issue here do not support an outrage claim as a matter of law. The Alabama Supreme Court first recognized this tort in *American Road Service Company v. Inmon*, 394

So. 2d 361 (Ala. 1980). Since that time, the court has made clear that this theory should be reserved for only the most egregious conduct and has consistently defined that conduct as being "extreme," "outrageous," and going "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." *See, e.g., Jackson v. Ala. Power Co.*, 630 So. 2d 439, 440 (Ala. 1993); *Thomas v. BSC Indus. Contractors, Inc.*, 624 So. 2d 1042, 1044 (Ala. 1993). Not only must the conduct be egregious, but the resulting emotional distress must be so extreme that "no reasonable person could be expected to endure it." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). For this reason, it is a tort remedy available only in the "most reprehensible situations." *Moore v. Beneficial Nat'l Bank*, 876 F. Supp. 1247, 1261 (M.D. Ala. 1995).

The Alabama Supreme Court has held that job terminations generally do not constitute this type of outrageous conduct. *See Harrell v. Reynolds Metals Co.*, 495 So. 2d 1381, 1387 (Ala. 1986); *Wood v. Jim Walter Homes, Inc.*, 554 So. 2d 1028, 1028–29 (Ala. 1989). Federal courts sitting in Alabama similarly hold that discriminatory conduct in the workplace generally is not actionable as a claim of outrage. *See Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1319 (N.D. Ala. 2002); *Bell v. Eufaula City Bd. of Educ.*, 995 F. Supp. 1377, 1387 (M.D. Ala. 1998).

In this case, Gibbons' outrage claim arises from the allegation that he was fired from his job because his district manager preferred a younger worker. These facts do not approach the egregiousness necessary to support a claim under Alabama's limited tort of outrage, nor does the record reflect evidence of emotional distress severe enough to support this tort remedy. Without sufficient evidence of an underlying tort, no reasonable jury could find in Gibbons' favor on his claim of negligent or wanton hiring, training, supervision, or retention.

### 2. *Intentional Infliction of Emotional Distress*

Gibbons separately states a claim for intentional infliction of emotional distress, which is the same cause of action as the tort of outrage. *Thomas v. Williams*, 21 So. 3d 1234, 1237 (Ala. Civ. App. 2008). As discussed above, Gibbons has not introduced evidence of any conduct or emotional distress that supports a claim of outrage under Alabama law. Accordingly, the state-law claim of intentional infliction of emotional distress also is due to be dismissed.

## IV. CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that Defendants' motion for summary judgment (Doc. 68) is GRANTED IN PART and Plaintiff's claims of retaliation; libel; slander; defamation; invasion of privacy; tortious interference; negligent or wanton hiring, training, supervision, and retention; and the

tort of outrage are DISMISSED WITH PREJUDICE.  The motion is DENIED IN

PART as to Plaintiff's claim of age-based discrimination.

DONE and ORDERED on August 26, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE